Your Honor, well, after setting up, I have boards, but I know it's hard for you all to see it. I have hard copies of the monsters, if I can get them out to you. Please give them to the clerk. Mr. Shulman? The infringement question here is straightforward. There is only one plain limitation involved, namely the phrase selection of a particular letter. The parties agreed that the district court's construction of this phrase was correct, and as shown on the first chart in your handout, paragraph 10, the court held this phrase means, quote, choosing a particular depicted letter from a depicted sequence of letters by contacting or coming into proximity with that particular depicted letter. Now, given this construction, the court's finding that the defendant's power touch product lacks this one limitation is clearly erroneous. As I'll go through now, the evidence produced by both parties was entirely to the contrary. Why can't we look at the record that was made here and look at other plain limitations as well? Why are we foreclosed from doing that? Because the only findings made by the court related to this plain limitation and this plain limitation alone. Well, if we conclude that the record here wouldn't support infringement under another claim limitation, can't we decide the case on that ground? I don't believe so, because you need to. Why not? What case says we can't? Because infringement… Wait. What case says we can't do that? I don't have a case, I don't have a case site in mind, but infringement is a question of fact, and this court, I don't believe, is allowed to make findings of fact with respect to the infringement issues. If we conclude that the record wouldn't support any other conclusion? Well, there were no findings made about how the product operates other than with respect to the selection issue. But you're not answering my question. My question is, if we conclude that this record wouldn't support a finding of infringement on another claim limitation, there's no need for a finding of fact under those circumstances, why can't we decide the case on that ground? Because in order to do that, you would have to make findings about what the record shows insofar as how the product operates, and I don't believe Your Honor is allowed to do that, unless I'm misunderstanding something. Well, I think you're misunderstanding my question, because I'm saying we look at the record, the record is fixed, and we conclude that there is no way a reasonable jury or a reasonable fact finder could reach any other conclusion under another claim limitation, we can decide the case on that ground, right? Well, I don't believe so, but let's assume that that is the case, because obviously I'm missing something in responding to your question. Let's assume that Your Honor is right. I believe at least under that set of circumstances, we ought to be given an opportunity to have notice of what position it is that you think the record supports and be allowed to address that, because nobody has addressed that here. We've limited it to the one finding made by the district court. But don't you lose on that finding, because the accused doesn't generate a signal corresponding to a sound associated with a selected letter. It associates the word. It produces a word, not a letter. No, because Your Honor is using, actually if you look at the third chart, Your Honor just used a term that doesn't appear in the claim.  No, because what Your Honor said is it doesn't generate a signal corresponding to the sound associated. A sound. Okay. A sound. And as we pointed out in our brief, they argued below, and they lost repeatedly, that this claim requires that you only generate the sound of the selected letter, and Judge Sleep repeatedly rejected that. And why do we care about that? I mean, we do, for better or worse, construe these things de novo on appeal here. Yes. So what's wrong with the construction that Judge Lurie asked you about? Okay, because this does not say that you are required to generate only the sound associated with the selected letter. It says you must produce a sound. Associated with the selected letter. Correct. And as long as you get a sound associated with the selected letter, then you have satisfied this claim limitation, regardless of what other sounds one may also get. And indeed, when they're experts… Well, that's the question, right? Whether it has to produce the d sound, whether a sound means the sound, or whether it means a sound combined with other sounds. That's correct. And if a child were actually given 50 sounds, and under your theory, touching the selected letter could give 50 sounds, 49 of them have nothing to do with the letter. As long as one of them has to do with the letter, the claim limitation is satisfied, right? Is that correct? Well, within the context of the word… Is that correct? That's what I'm about to address. Yes, within the context of the word, if you have the words cat, for example, and you hit the A in cat, the way the device, the accused device works is it will say cat, c-a-t, and it will give you the phonetic sound of the letter that you have selected as well as the phonetic sounds of the letters that you did not select. So it's giving you more than the claim requires, but it is giving you… And if it gave you 49 other sounds too, that wouldn't be a problem under your view, right? Well, as long as they're consistent with what appears in the depiction, yes. So the child would have to sort out the one sound corresponding to the letter from the 49 other sounds. Does that make sense in terms of a claim construction for a device like this? Well, if there happen to be 49 letters in the word, but I'm not addressing a situation where it says c-a-t and then you hit one of these letters… Take six other sounds. Take six sounds. You have to sort out the one sound from the six sounds. How is that helping the child understand what the relationship is between the letter and the particular sound, which seems to be the object here? Well, the claim is to the device. It isn't to a teaching methodology the child uses to associate the sound of letters with where they appear in the word that's depicted. We're talking about how the device operates here. That's what this claim is, right? I understand. But the object of the device would seem, wouldn't it, to help the child associate the letter with a particular sound, not with six sounds, which might change from word to word, depending on whether the letter a was part of baker or aardvark or something else. It may very well be, Your Honor, that it is a better learning tool or a better teaching tool to have a device which when you press c-a-t does those cook. I admit that. Mr. Shulman, finish your sentence. That may be a better learning tool, but the fact that it gives you the sounds of all of the letters in addition to the one that you've selected may make it a less good learning tool, but nevertheless one which is covered by the language of the patent. Obviousness. Why isn't this the case, starting with the Bevan reference, where you've got a piece of prior art and the invention here is simply adapting it to modern electronics, processor, memory, reader. And so pretty obvious to take an old invention and add modern electronics to it. Well, that's not so at all, because let me briefly run through that. And where the court erred, it erred in the starting point, because it held that, quote, in terms of functionality, Bevan is identical to Claim 25. And that plainly isn't the case. And the reason is that there are elements of Claim 25 which the court itself found don't exist in Bevan, and therefore the function of those elements is not performed. That's the starting point. Well, I told you, the processor, the memory, and the reader, right? No, and no encoded substrate, because that's what the reader does. It reads the encoded information that's contained on the substrate, and there is no encoded information. You're saying there are four things? Yes, there is no encoded substrate. It doesn't perform the function of the substrate that's required by paragraph data construction.  Putting aside even having a reader, it doesn't perform the function of the reader, which is automatically detecting the encoded information on the substrate. It doesn't perform the next plain function of the reader, namely communicating the identity of the depiction to the processor. And, of course, it doesn't have the processor at all, much less one that generates the sound in response to the selection. So you're saying it's not just taking an old device and incorporating modern electronics into it? Not at all. And, indeed, the reader, the one thing that was missing from the combination of the SSR and the Bevan patent, it's not a question of updating Bevan with a reader. The readers, according to their own expert, had existence since the 1960s, which is a decade before Bevan came into existence, and two decades before SSR came into existence. So it's a step backwards into history rather than updating to add a reader to this combination, particularly when their expert also admitted repeatedly at a cross, as he saw in Greece, that he never saw any suggestion anywhere in the world by anyone that anyone wanted to include a reader with either Bevan or SSR or the two of them put together. Does that answer your question? I'm out of my element, so I'm happy to answer questions or return to what it is I was programming myself to say. But if you have further questions, I would be delighted to answer them. Or you can say, but you can respond. Why don't I do that, since we did get a little off, and that way I can address my comments to my adversary. All right. Mr. Glauber? Thank you. I would submit that this Court is certainly permitted to base a finding of non-infringement as a matter of law if an examination of the record shows that the record will not support a finding of infringement. And, indeed, we briefed that issue with respect to one of the elements that the Court below did not address, and that is the sound associated with the selected letter. The claim talks about a sound that the selection of the letter must generate a sound that is associated with the letter. That is, a given letter can't have more than one sound. A or ah, for example, for the letter A. And then the claim goes on to say the sound being determined by the position of the letter. In other words, if it's a long A, because that's where it appears in the word, then the sound generated is the long A sound. But the sound has to be associated with the selected letter. We briefed that in our brief, and I think they responded in their reply brief, even though the District Court did not address that issue. And, in fact, that is the antithesis of the way that the PowerTouch operates. You cannot associate, even if you touch a letter, there's no indication anybody ever actually selected a letter in that device because it's not designed for that, but if you touch the letter in the phonics mode, it gives you all the phonemes of the word, I'm sorry, the phonemes of every letter within the word, not merely the phoneme of the letter that you selected. Mr. Galbraith, I want to ask you about obviousness. You've got this Bevan reference. It's missing three or four aspects of claimed invention. What's there to tell you to take this and take that and put all these together? The Bevan reference embodies, I think everybody would agree, what we would now consider obsolete technology. It's what they had at the time. It's a phonograph record player. It doesn't have a processor because it didn't need one. It didn't have a reader because it's inappropriate for that technology. By the time, 1993, when this invention supposedly was made, processors were ubiquitous. Readers were ubiquitous. Phonograph records, you probably couldn't even buy one if you wanted to. They were gone from the marketplace. This is what the testimony was. The district court was entitled to credit that testimony, the testimony of our expert who said that somebody skilled in the art who looked at Bevan would recognize that you could update it by using a processor, memory chips, and devices like that. Was the Texas Instruments device prior art here? It was, Your Honor. Did your witness testify about that? He absolutely did. He pointed out that the SuperSpeak and Read device embodied processors and memories and updated electronics. It was specifically different. Did it include a reader? It did not. There are other prior art that included readers. Was the reader the only thing that was missing from the combination of Bevan and the Texas Instruments device? I believe that the reader would be the only thing missing from that combination. Your opponent said there was a fourth item. Well, I think all the items that were missing. The substrate? Certainly the Texas Instruments SSR, the SuperSpeak and Read had a substrate. It just didn't have a reader. The user would have to touch a star or a block or something on the book to determine, to signal to the machine. The reader wasn't updating with modern technology, according to your opponent. He said that was old and so it was really reaching back. It wasn't just updating an old device with modern technology. I don't think the reader is really not appropriate for something that includes, as it's memory and it's processing, a phonograph record. It just doesn't fit with Bevan. The point of Bevan is it's an interactive toy. Well, that simply derogates from the quality of the prior art, doesn't it? The reader is in the claims. But readers were ubiquitous in interactive electronic toys by that time. It was a matter of choice. There were several prior patents. The expert testified that someone skilled in the art would be motivated to add a reader. That testimony, the district court was entitled to credit that testimony. With respect, I don't think this court can review the credibility of the expert's conclusion with respect to what somebody skilled in the art would have believed at the time. What exactly did he say about the addition of the reader? Do you have a page? He said it would have been obvious to someone later on. What page are you talking about? My note says it's 2269. 2269. To modify the Bevan device to include a reader and processor when those things were available. The Bevan device, as I said, was a sort of different approach to it from a technical point of view, but it is exactly the inventive idea. It is functionally equivalent from the point of view of the user of the device. From the point of view of the user of the device, it is, as our expert said, pick a letter, hear a letter from a word. It does exactly the same thing as claim 25. The fact that the Bevans did not have available to them in 1971, this technology does not take away from its relevance. I think there are other references. I've been handed to 2246. He talks about the reader. He says, I thought it would be obvious to one of the ordinary skill in the art. Engineers knew about IBM cards with holes in readers from their earliest days. There were also a couple of patents specifically on readers and toys that read holes in the words to know what was there. That's the testimony of our expert who was definitely skilled in the art and 30 years experience in designing electronic toys. With respect to the selection issue, the district court's construction that both parties accepted says choosing a particular letter from a depicted sequence by carrying out a certain act, touching or coming in close proximity to the letter. As Mr. Shulman pointed out, this is a device claim, which means that this selection, this act of choosing, must be given effect within the device. It's not a mental act. It has to be manifested by the device itself. The claim element is not met merely by touching because the district court said that the touching has to affect a choosing of a particular letter from within a word. Saying the letters are choosable is not the same thing as saying they are touchable. That's the distinction. That's the distinction the district court made. That's the distinction the parties accepted. Choosing requires a distinction between what is chosen and what is not. Leapfrog's interpretation simply reads out the choosing part, reads it right out of the district court's claim construction. But it's essential to that construction because that's what the invention was. I don't understand. I mean, when the word baker is there and the child chooses to push A, that's a selection of A, isn't it? I mean, it may not produce what's required under the claim limitations, but he selected a letter. He has done nothing more than touch the letter because there is no manifestation of that in the device. That's a mental act that is outside the device. The device, the judge's claim construction under that interpretation, in terms of the device, touching the A while thinking about an A is no different from touching an A just by happenstance while not thinking about an A. And that's the point of the district court's construction. The district court recognized that the invention here is a device in which the user can reach into a word and select out a letter to understand, to hear the phonetic sound of that letter in the context of the word. That's all that is described in the specification. Both embodiments that relate to Claim 25 have that function, are built that way. There's nothing in the specification that hints at the idea of the power touch, that is, you touch the word somewhere and you get, no matter where you touch it, you get the same response. There is no written description of anything else in the specification other than the way I've described it. And the district court was clearly correct in its understanding of the device. The power touch makes no distinction between the letter that's touched and the letter that's not touched. There's no way what the user is thinking or wants to do makes any difference. The device treats the entire area of the back of the substrate under the word the same. It doesn't make any distinction between parts of that area. Even if you touch between the letters in Baker, you don't touch any letter at all. It acts the same way as if you touch A or B or K. Or if you touch three of the letters at once, it acts the same. It makes no distinction. The only reason we have a case here today is that by chance, some of the letters, some of the words in the books that are used in the device are in a large enough font that it is possible for a small child to reach in and touch one letter without touching another. That's the only reason we're here today. There's nothing, in fact, if the user wanted to carry out the invention described in the patent using the power touch, couldn't do it. The power touch frustrates the user trying to carry out that invention because it won't work that way. It can't be made that way. It can't be made to work that way. LeapFrog, at the time the power touch was introduced, recognized this distinction itself. LeapFrog's, the designer of LeapFrog's curriculum, Dr. Calfield, professor of education, said that the big problem with the LeapFrog, I'm sorry, the big problem with the power touch is that the child can only point to a word. Can only point to a word. That's the issue here. He was correct at that. The child can only point to a word. He went on to say, so when the audio sounds out the word, there is no connection to the letters. Indeed, Mr. Wood, the inventor, when he heard about the power touch, he asked around, he wanted evidence to back up the capability of the patented invention and discredit the different, the power touch approach. The district court's turning to validity. The district court made the requisite Graham analysis here. The district court reviewed the prior art, determined the scope and content of the prior art. There's no dispute about the way the district court actually described how the various devices in the prior art worked. LeapFrog does not say that the district court didn't understand how the Bevan device worked or didn't understand how this other device worked or didn't understand what the differences were or didn't understand the ordinary skill. The only thing that they're seized upon is the court's use of the term functionally equivalent to describe the Bevan device and compare it to the patented device. But it is functionally equivalent from the point of view of the user. It permits the selection of a letter from within a word, just like the patented device. The concept of the invention is embodied in Bevan, but in old technology. So therefore the district court was correct to characterize the problem as one of 1993 updating the Bevan device, updating the reference or updating the technology. The district court's analysis of the differences between the prior art and the claim was correct. The district court recognized that there were things missing from the Bevan reference, and it recognized there were things missing from the super-speak-and-read. But it recognized that someone skilled in the art would have the motivation to make those changes. Motivation gets a lot of press in the patent bar these days, but the district court correctly found, I believe, that someone skilled in the art would have been motivated to update the Bevan design and update it in the way that the claim convention does so. And indeed, as this court said in the Dystar case, the desire to approve a product is universal and indeed commonsensical. Here the court recognized that the motivation to approve Bevan was commonsensical, and the court was, that's a finding of fact which cannot be clearly erroneous. I think my time is up. Thank you very much. Mr. Shulman. A couple of quick points. First, returning to Your Honor's question about finding no infringement based on the record that is before you concerning this limitation that Judge Lori mentioned, namely the assignment associated with the selected letter. We submit that, given the record here, you couldn't make such a finding. And here's the citations and the reason why. In the phonics mode of operation, which is the mode where letters are sounded out in the PowerTouch, when a user touches a depicted letter in a word that appears in the PowerTouch books, the PowerTouch always plays an individual sound, i.e. a phoneme, associated with the selected letter as that letter appears in the word. And let me give you the transcripts for that that are in the appendix. It's A2316-19, which is Mr. Milner, their expert's admission on that point. It's at A1431-32, which is Dr. Lee, one of our experts on that point. And it's at A1500-1509-11, which is Dr. Henry, our other expert on that point. And it does it in the course of spelling the word, right? Pardon? It does that in the course of spelling the word. It says the word and then sounds it out phonetically, phoneme by phoneme. But isn't that different? Dan? Isn't that different, Dan? Than the infringing... That is how the infringing device works. That's what they do. Isn't that different from the invention? No, because the invention, as claimed, simply says you must get a sound associated with the selected letter. It doesn't say to the exclusion of other sounds that are also contained in the word that is depicted. When you touch a letter. Correct. It doesn't say you can't have other sounds. And indeed, their expert admitted, as we pointed out in our brief, that you could have other sounds. What they claim is that there has to be something distinctive that sets apart the sound of the selected letter from the other sounds that might be played. And I said, where do you draw the line on the cross? And he said, well, that's very difficult. I can't draw the line. Other sounds are permitted, but I can't tell you which other sounds are and which other sounds aren't. If you look at the patent, if you look at column one of the patent, in line, I guess it's 41, 43, it talks about the device enabling the child to establish a relationship between the symbols or letters and the sounds and names associated. So the problem that I see with your construction is that when you press this one letter, it doesn't enable you to develop that relationship because it gives you all the letters from that word. Well, it depends. Is it a perfect one-to-one relationship? Absolutely not. I admit that. Like I said earlier, is this a less perfect way of teaching modality than what is described in a preferred environment? Absolutely not. Saying could, when you hit cat, is perhaps better, given the passage that Your Honor has just looked at, than saying cat, could, at, to. But nevertheless, there is an association with the three letters that appear there and the sounds that are played because the child will learn that could, at, to is associated with the three letters that are in that word. Is it imperfect? Yes. But imperfect infringement is nevertheless infringement, as this Court and other courts have held. So let me move on briefly to the obviousness issue and some of the points that he raised. In terms of updating the prior art, the Court said that the problem to be solved by the archetypal inventor would have been to update the functionality of Benham. And the only thing the Court cited for that is the transcript that appears at A. 2235-36 and A. 2244-46. But as we explained in detail in our opening brief, at pages 54-55, the cited testimony nowhere mentions updating Benham at all, much less that updating Benham was the problem to be solved. It doesn't say word one about Benham in the only passage that the Court cited to you for that proposition. And then the Court also noted that it would have been obvious to use the components disclosed in our patent to update Benham. And this conclusion puts the cart before the horse, because the Court used the 861 patent's disclosure of which components are used and the manner of using them as the road map or the guide for updating Benham, which wasn't even the problem. But even if that was the problem, that is classic hindsight, using our disclosure of our components and the manner that they're used and then applying that as the road map for updating the prior art, which is exactly what the Court did. And finally, I believe that the Court found here that there was, quote, substantial evidence of commercial success, praise, and long-felt need, and didn't take that into account properly because he relied on Mr. Milner's opinions on obviousness, even though Milner confessed embarrassment to trial at never having taken into account these secondary considerations before reaching his conclusion. Thank you very much. The case is submitted. All rise.